Our fourth argument of the morning is in Appeal 23-2473, Mesenbring v. Rollins, Inc. And Mr. McKnight, yes, good morning. May it please the Court. My name is Neil McKnight. I represent Melissa Mesenbring. She's the executor of the estate of Derek Mesenbring and the mother of their two children, Candace and Jackson. As the Court knows, Mr. Mesenbring died of methylbromide poisoning while in the employee of IFC. And the primary issue in this appeal is the application of the doctrine of direct participant liability as it applies to Rollins, who's the parent company for IFC. The trial court erroneously concluded that there was insufficient evidence to defeat the defendant's motion for summary judgment on this topic. But in doing so, the trial court made determinations of material fact regarding a number of pieces of evidence. The first and primary piece of evidence was the interpretation and characterization of Rollins' approval level guide. Say that again. The Rollins' approval level guide. The Rollins' approval level guide was a set of mandatory procedures that Rollins used to control and determine expenditures, including some day-to-day expenditures of Rollins' wholly owned subsidiaries, including IFC, where Mr. Mesenbring worked when he died. The trial court erroneously characterized the approval of the guide as a method by which to request capitalization of expenses. But the guide is much, much broader. And the evidence does not support the approval guide was used solely for the purposes of requesting capitalization of expenditures. To the contrary, the evidence of the guide itself suggests that it was used for a broad number of different concepts. And in fact, the testimony of Mr. Levitt, who's a Rollins employee who characterized himself as a president of IFC, specifically said it was part of a decision to see whether or not Rollins wanted to capitalize the expense or was going to be a capitalized expense of the underlying subsidiary. To the point of the determination, and the trial court said, hey, that's what this is about. And so this doesn't rise to the levatory of what the Forsyth court called eccentric budgeting, where you're going out of the ordinary to get involved in the day-to-day decisions. And if you look at the- In a way, right, that would create a foreseeable risk of injury here to the party injured, you know- Certainly. Yeah. And so the overview to the guide specifically provides as follows. The Rollins approval level guide should be utilized to assist with purchases and business decisions. Use it to determine required approval levels and the routing of emails and applicable paperwork. The approval level guide must be adhered to at all times. And in fact, Mr. Levitt describes it as applying to IFC, but then he later describes it, contradicting the express language of the document, as for the purposes of awareness only. The trial court made the factual determination by determining the meaning of this document, meaning changing the language of the document itself and ignoring the plain language and accepting the inferences that favor Rollins when presenting the motion for summary judgment. So the court, in this circumstance, added this sort of addendum to the level guide saying, but it's only for capitalization of expenses, which is incorrect. In reality, the approval level guide addresses a number of different issues. Advertising expenses, it adds to legal settlements, bonus calculations. I mean, that may all be right, but aren't you, at least at this point in your argument, you're still at a level of generality that's divorced from the requisite inquiry? I think- And the parent corporation's insistence that the subsidiary, here the employer, follow the guide, right, created a foreseeable risk of injury or death relating to the handling of methyl bromide. I think it doesn't have to be that specific. I think that's lifting foresight exactly from the sort of language itself, and I think it's a little bit broader than that. But nevertheless, if you look at the testimony of Mr. Levitt, Mr. Levitt says, I set the profit goals, I determine bonus, I determine employment- Yeah, but go the next step. And the next step is, it should certainly be, and the proper inference from that is that these people who are working at IFC, who are having what were described as unrealistic profit expectations being imposed on them, taking shortcuts with respect to whether or not there is a proper safety protocol put in place regarding methyl bromide, as well as a myriad of other issues that are presented by the case. So your point is that from what you just articulated, it's a fair inference- It certainly is. That health-related risks would be present with respect to the handling of any particular chemical. That's correct. And I think one of the other things is that if you look at Mr. Levitt's testimony, Mr. expectations as being unrealistic, but somehow they seem to meet them, Mr. Levitt also specifically testifies that he says, you know, if you're not meeting your profit expectations, you're going to get a talking to, and potentially that can lead even up to termination. So- How do you get around the Forsyth's conclusion that just mere budget mismanagement alone is not sufficient for direct liability, direct participant liability? Because that's what it sounds like you're arguing here. I am arguing, but there's additional facts, which the trial court did not address in response to motion to argument and judgment that we argued in our briefs, and that is the control of the premises. So there's been a lot of discussion about how Mr. Messenbrink died, and there's a number of factors involved. One is the transfer from a large cylinder to a small cylinder. Second, it's the storage within the facility itself, meaning it wasn't under a ventilated hood, it wasn't in a ventilated place, because the requirement- The evidence of control. The evidence of control is- Over the facility, and over the storage facility, and the storage containers. Well, because they controlled the premises, because if you look at the documentation the evidence presented, subsidiaries of Rollins are the lessor and lessee of the premises where this methyl bromide that poisoned Mr. Messenbrink was located. So control of the premises as far as access and its use by the subsidiary for its operations is distinct, right, from control of property that's used in the subsidiary's operations, in particular methyl bromide. So that's why I wonder, are you stopping one level above where you need to go? No, I'm going a little bit further, because one of the things that's been discussed is whether or not this was a capital expense that applies to Rollins, and that was specifically stated in the documentation. In addition, if you- But even if it was, how does the control over the lease and the obtaining of the property establish any kind of control over the activities here that caused the accident? Because IFC could not, under those circumstances, requested the appropriate fixtures or the proper storage of methyl bromide. But it goes further than that. The evidence is even- But what precluded IFC from purchasing those things itself? Because that's part of the approval level guide that's driven by profits and bonuses down the road. But isn't that just if they want Rollins to pay for it, as opposed to to pay for it themselves? No. The approval level, that's the point of the approval level guide. It applies not only to Rollins, but it applies to the subsidiaries themselves, and it's not a question of whether Rollins is going to pay for it. Is there any evidence that they ever requested any additional safety measures at the facility that were turned down? They did not. That evidence has not been presented. But I will say this. What did happen is, if you look at the IFC protocol and the standard operating procedure, there's no mention anywhere in IFC's standard operating procedure about how to properly store it. Should it be in a ventilated place? In fact, Mr. Ponton, who's asserted that he's the, what I will call the penultimate employee of IFC, described it as being a label description. And if you look at the label description, and he describes it himself, it's to put it in a well-ventilated place. There's no analysis done by IFC whatsoever regarding whether or not this is an appropriate place to store methyl bromide, because they're not in control of the premises. Why would they ever do that? Next, after Mr. Messin brings death, what happens is, there's an investigation. But that investigation is conducted by Rollins. Rollins hires the engineers. Rollins conducts the safety audit of the premises. What's the relevant of all of those activities after the fact? How could that be evidence of foreseeability? Because that shows, after the Illinois Department of Public Health and OSHA determined that it was improperly stored, and that was the basis of the fines that were imposed on IFC regarding that, that Rollins had control of the situation. Rollins ultimately- But all of that is after the fact. That's right. That's a remedial measure. I'm not sure how that helps you. But that's under Rule 407 of the Rules of Evidence. That's an exception to the barring of that, because there's a question about whether or not there's a dispute as to control. And so, for those purposes, those documents, those recommendations, all come through Rollins. And then Rollins issues the memo describing how IFC should do its work in transferring, because what ended up happening is, Rollins said to IFC, we don't want you transferring from large cylinder to small cylinder anymore. And then they went out and sought- Maybe this is Judge St. Eve's point, or at least it's on me. The fact that they made some improvements, Rollins dictated them to the subsidiary after the fact, doesn't prove, you know, the parental participation, the parental direction in the first instance. Well, I think it does, because if you read it, if you look at it in conjunction with the lease, where they have no control over it whatsoever, that falls within their rubric to decide what to do and make sure that the property- IFC has no control over what goes on inside of the premises. IFC is not a party to the lease. I understand, but that doesn't dictate what's going on inside of it. But if you look at the subsequent measures taken, they characterize, meaning Rollins characterized them as capital improvements to the premises of which they control through their subsidiaries, that they sign off on, that they approve. There's no involvement in IFC whatsoever, other than the argument is, this is one of the smorgasbord of services that we request that Rollins do for us. But in reality, what ended up happening is these subsequent revealed measures reveal that they were in control of this portion, the configuration of the building itself, and the decision whether or not to install the appropriate equipment to avoid a very foreseeable accident when you have human occupation together with the storage of a chemical. And then at the end of this whole process, if you look at the decision tree analysis that's provided, what we have is a situation where the decision tree analysis is directed to Rollins. There's a discussion of what we'll call Mr. Messonbrink's death, but the next analysis is applying it to all of Rollins' facilities and all the physical facilities that are controlled by IFC where methyl bromide is stored, and in fact there's a series of recommendations that are made. That's evidence of control, and in light of the absence of any other standard operating procedure provided by IFC, that is a situation where they filled the gap, and the gap should have been filled by them all along. They knew that IFC was using methyl bromide. They own the building. The building requires improvements, and they didn't do it. I'm going to reserve the rest of my time. Yeah, no, very well. We understand your position. Thanks. Yep. Mr. Lee, good morning. Good morning, Your Honors. May it please the Court, my name is Josh Lee. I'm here on behalf of the Appellee Rollins, Inc. The first thing I would like to focus on is what was actually decided by the District Court and what is the material portion of that decision. The material portion of that decision focuses on the causation requirement set forth by the Forsyth Court, the Illinois Supreme Court, in the Forsyth case, and what was decided below is whether Rollins, the parent company of IFC, which is the company that employed Mr. Meisenbring, whether that parent corporation can be held liable for Mr. Meisenbring's work-related accident under an exception to the normal rule that parent companies cannot be held liable for acts of their subsidiary, and that exception is called, appropriately, the direct participation exception in the direct participation theory of liability. All the parties in this case agree that Forsyth is the controlling precedent, and at the summary judgment stage, Forsyth requires the Court to ask three questions. First, in conjunction with Rule 56, is there a dispute of material fact? There we go. Second, if there is a dispute of material fact and that dispute is genuine, could the Court of Conclusion that Rollins exercised what's called eccentric control over IFC? And then third, if there is some evidence of eccentric control, was the conduct of Rollins using that eccentric control a cause of the accident? In this case, what the District Court concluded after examining all of the evidence is that there is no evidence that Rollins did anything that caused the accident. So regardless of whether there's a question over the Approval Level Guide or not, it's not material because the evidence simply doesn't tie any of the alleged conduct to Mr. Meisenbring's accident. You agree, though, that I think the point that is being made by your adversary is that he's not using these words, but this is basically what he's saying, is this can be shown indirectly. It can be shown by circumstantial evidence. What inferences are fair, especially when you view the evidence in the light most favorable to the non-moving party? So you could do that if there was evidence actually linking any of the conduct to something that happened. As direct participation liability, the Illinois Supreme Court did not say you need direct evidence of direct participation liability. It can still be shown circumstantially. Not on the causation front, Your Honor. You would have to have, well, you could have circumstantial evidence, but in this case there's no circumstantial evidence that leads us to a link between the alleged conduct. So that's more of a fact and evidence point. Well, I think the facts and the evidence are tied together. Yes, it is a fact and evidence point. But in this case, you have to look at the evidence and what they've alleged and see whether it actually leads to the accident. And there's a couple of pieces of that. So first of all, if we were to take the approval level guide, for instance, let's assume that the plaintiff's, the appellant's interpretation of that is correct and there were approvals that were required. There's no evidence that IFC ever asked for an approval or asked Rollins to pay for something or approve an expense that was denied, much less any expense that led to the accident. We can look at the lease. The much less part, though, is the part that's legally significant, right? In other words, that's the part of this that I think, it has to be analyzed at a high level, somewhat of a high level of particularity. It's not like they requested approval to put in a new parking lot and it was denied. You'd say, what's the parking lot have to do with anything, right? In other words, what you're saying is there's no expenditure that was requested that bears upon the handling of chemicals, including toxic chemicals. That's correct, Your Honor. In fact, there's no evidence. Is that the right question to ask? Because when you say, well, there's no evidence they did not lend approval to an expenditure, I think, well, you've got to tie it to the chemical that caused the death. You do, Your Honor, but even before that, you'd have to show that they denied some expenditure. There's no evidence of a denial or a disapproval of any expenditure at all in this case. So you can't even get to the second question because there's no evidence that Rollins ever disapproved any expenditure. What do we know about what Rollins required, said, suggested by way of any kind of training materials that bear upon the handling of chemicals? What we know about that. Training employees, ensuring their safety, et cetera. What we know about that, Your Honor, is that, and it's important to understand this, IFC, the employer, actually existed since 1937. It was purchased by Rollins in 2005. Prior to, and this is admitted in the statement of facts, prior to that purchase, IFC had its own health and safety department, and it wrote its own standard operation procedures with regard to how chemicals, including methyl bromide specifically, needed to be handled by the employees. After the purchase, IFC maintained its own health and safety department. It did all of the training with regard to methyl bromide and the handling of chemicals. Rollins was not involved in any of that. Rollins Health and Safety Department was not involved in any of that. And the reason for that, and I think that's important in this case, the testimony is because this was a highly specialized area that IFC specifically did. And so, Rollins didn't want to do anything that would override IFC's own discretion in determining how best to run its business and train its employees and store those chemicals. What about the learning management system? Yes. Why wouldn't that raise an issue of fact on the training? It doesn't raise an issue of fact because there was nothing about methyl bromide or the handling of those chemicals that was part of that training. More importantly, the testimony was that except for generalized OSHA-required training, ladder safety, it was actually IFC that determined what training went into the learning management system for its employees and what training was required for its employees, and that was not done by Rollins. Effectively, Rollins provided a distribution platform but didn't determine the content. With regard to the lease, Your Honors, it's simply incorrect to say that IFC was not a part of the lease. You have both versions of the lease. There was only an amendment that was later added. IFC was the original owner of this facility. This facility was owned by IFC when it was purchased by Rollins. IFC occupied and had control over the facility. It continued to occupy and have control over the facility exclusively. After the purchase, there was a typo on the extension of the lease. But everybody agrees, and all the testimony is, that IFC continued to maintain and operate that facility, and in fact, the terms of the lease were that IFC had to be delivered exclusive possession of the facility and was required to maintain that facility. Not Rollins, not any other company. And so really, all of this comes back to there's no conduct by Rollins that is anywhere, any way related to Mr. Mesenger's accident. Unless the court has additional questions, I think I am done with my argument. Okay. Hearing none, Mr. Lee, thank you. Thank you. Okay. Mr. McKnight, back to you for rebuttal. One thing I would point out is that the training that IFC provides is that there is, it's only with respect to application. And this goes back to my point about... What do you mean? Meaning application of methyl bromide. It doesn't talk about where to store it, what type of circumstances should the canisters be in. Should they be in the same space that people are occupying for human habitation or human occupancy? There's none of that. That's not in the IFC standard operating procedures. There's a lot of... But there's nothing that Rollins provides that tells you how to store or handle it. They do. As the remedial measure, they do. They describe it in particular. What do you mean? Meaning they specifically describe how it's properly stored when they do the analysis post-investigation. But there's nothing in terms of the training where they're in charge of that or they instruct IFC employees on how to handle the chemicals. They don't. They don't. And this is... How do you get around the causation point then? The way you get around the causation point is because they have, if you look at the totality of the evidence here, the totality is that the guide requires approval. The guide is the basis by which they determine bonuses. Mr. Levitt, who by the way is a... But you're giving us pieces of evidence that might talk about control or involvement of the parent. But that conduct under the law has to cause the accident. Are you disputing that's what the law is? I don't think the finding of Forsyth is so specific that that's what it is. For example, I think... What about subsequent cases from the Illinois courts that have interpreted it that talk about causation? I think there's an element of it that does require a connection to causation, but it and dive down into a microscopic look at things. You can have a general protocol of safety over what the underlying... It's got to be foreseeable. Can we agree upon that? It does have to be foreseeable. And certainly foreseeable in this circumstance that when they took control of the building and they knew that IFC was doing methyl bromide and they also did applications of their own methyl bromide. In fact, Mr. Levitt testified that he applied methyl bromide. That they understand it's certainly foreseeable that when you walk into a building that has no or improper ventilation or hasn't even evaluated the building for ventilation, that that's certainly foreseeable that you should have proper ventilation and those type of things should be done. Are you disputing that control is required under the law? That's what the district court's focus was and I did not see you disputing that in your briefs. I think what it is is that the evidence as you look at it in its totality and with the inference to the plaintiffs, you have to establish that or you have to see that there is control. They've exercised control in a number of different areas. What they've done is they've simply decided that, oh, there's no mention of methyl bromide so therefore it was something that belonged to IFC. I don't think that's right because Rollins dipped down on a number of different occasions on a number of different topics relating to safety and they did it without request from IFC. They imposed it upon them and then at the end of the investigation, we look at the situation, they imposed it upon again. The last thing I want to talk about is, and I'll be brief, is that they're very sloppy. They're very sloppy. It's not a typo on the lease. It's a complete change of the parties. Mr. Leavitt is not an employee or wearing two hats. He wasn't appointed by a board of IFC because IFC's governance structure requires a board and appointment of officers. Never done. Completely ignored. They've ignored the formalities of the LLC. Okay. We got it. I mean, you argued this. We got it. Yeah. And I think for the reasons why is that the court made an inference, the trial court made an inference in favor of Rollins versus, as Your Honor described, the circumstantial evidence across the board suggesting control, which should have made it a question of fact and therefore, the summary judgment should be entered and we ask that the matter be returned to the trial court. Okay. Very well. Mr. McKnight, thanks to you. Mr. Lee, thanks to you. We'll take the appeal under advisement. Our fifth argument.